## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

E.H., *a minor by his parents and next friends,*
*G.H. and S.H.,*
G.H. and
S.H.,

      Plaintiffs,

      v.

MONIFA B. MCKNIGHT *(officially as)*
*Acting/Interim Superintendent*, and
MONTGOMERY COUNTY BOARD OF
EDUCATION,

      Defendants.

Civil Action No. TDC-21-2297

## MEMORANDUM OPINION

Plaintiffs E.H., who is now 18 years old, his father G.H., and his mother S.H. have filed a Complaint against Defendants Monifa B. McKnight, Superintendent of the Montgomery County Public Schools ("MCPS") in Montgomery County, Maryland, and the Montgomery County Board of Education, which administers the MCPS system, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482 (2018). Plaintiffs seek the Court's review of the decision in *E.H. v. Montgomery County Public Schools*, OAH No.: MSDE-MONT-OT-20-15685 (July 7, 2021), issued by an Administrative Law Judge of the Maryland Office of Administrative Hearings. Pending before the Court are Plaintiffs' Motion for Judgment on the Administrative Record and Defendants' Cross Motion for Judgment on the Administrative Record. ECF Nos. 17, 20. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Plaintiffs' Motion will be DENIED, and Defendants' Motion will be GRANTED.

## BACKGROUND

### I.    Factual History

#### A.    Cabin John Middle School

E.H. was born in March 2004 and attended school in Japan for fourth, fifth, and sixth grades before enrolling for seventh grade at Cabin John Middle School ("Cabin John MS"), an MCPS school in Potomac, Maryland, for the 2016-2017 academic year.   During the time of the events giving rise to this case, E.H.'s father still lived predominantly in Japan, and E.H. often did not see him for long periods of time.   E.H.'s final grades for the 2016-2017 school year, issued in June 2017, consisted of three As, seven Bs, and one C, with his grade point average ("GPA") for each marking period falling from 3.00 in the first marking period to 2.71 in the final marking period of seventh grade.

In May 2017, E.H. was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and prescribed medication for that condition.   On May 18, 2017, E.H.'s mother, S.H., informed MCPS about the ADHD diagnosis.   Subsequently, on July 27, 2017, MCPS found E.H. eligible for academic accommodations under Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794 (2018), due to ADHD and developed a Section 504 plan to enable E.H. to better access the curriculum at Cabin John MS ("the Section 504 Plan").   Under the initial Section 504 Plan, E.H. was to receive classroom accommodations including that his teachers would provide "clarification of directions"; "break down assignments with interim due dates"; "provide rubric and assistance when starting long writing assignments and project"; give "preferential seating where he learns best and away from distractions"; "check [his] agenda book"; and provide "cueing for attention" in all of his classes.   Joint Record ("J.R.") 557, ECF Nos. 27-30.

On August 19, 2017, while home alone during the summer between seventh and eighth grades, E.H. expressed thoughts of suicide in a group message to friends after he learned that one of his friends in Japan had died by suicide. When his parents could not be contacted, E.H. was taken to Shady Grove Adventist Hospital by the police. Although E.H. stated that he "d[id]n't really want to die" and was not experiencing suicidal ideations upon his release, he was diagnosed with "[a]djustment disorder of adolescence" and "[a]cute depression," for which counseling was recommended. J.R. 314, 316. He was released the same day. Neither the visit to the hospital, the suicidal statement, nor the diagnoses were disclosed to MCPS at that time.

For the 2017-2018 school year, E.H. returned to Cabin John MS for eighth grade with his Section 504 Plan accommodations in place and demonstrated academic progress, with his final report card for eighth grade consisting of four As, seven Bs, and one C. Notably, his GPA by marking period rose from 2.28 in the first quarter to 3.14 in the fourth quarter. E.H.'s progress reports from that year stated that his accommodations "had a huge impact in [E.H.'s] improvements this school year" and that he was "doing a much better job of completing his work when he is in school." J.R. 46. Throughout the school year, Erika Murray, E.H.'s counselor at Cabin John MS, coordinated with E.H.'s parents and E.H.'s psychologist, Dr. Barbara Pearlman, to help monitor E.H.'s response to his new ADHD medication regime and dosage. On May 8, 2018, MCPS updated E.H.'s Section 504 Plan to provide additional support in preparation for his transition to high school, including: providing "copies of teacher notes"; the "use of [a] computer for written assignments"; "reduc[ing] distractions"; providing "notes and outlines"; "monitor[ing] test response"; and providing "1.5x extended time." J.R. 598-600.

In February 2018, Dr. Pearlman retired and referred E.H. to a new psychologist, Dr. Neil Bernstein. In May 2018, toward the end of eighth grade, Dr. Bernstein and S.H. submitted letters

3

to Kimberly Boldon, the principal of Thomas Wootton High School ("Wootton HS"), the high school to which he was assigned, requesting a Change of School Assignment ("COSA") in order to allow E.H. to attend Winston Churchill High School ("Churchill HS"), the high school which his friends would be attending. Dr. Bernstein's letter stated that E.H. "presented with symptoms of depression, anxiety, and poor frustration tolerance" after learning that he would be attending Wootton HS rather than Churchill HS, and that although E.H.'s "middle school experience had been going fairly well," he had recently "grown increasingly depressed and anxious" and had "expressed some suicidal ideation . . . and heightened anxiety about having to fit in to a new situation" at Wootton HS, because he "would no longer be around his peers." J.R. 55. Likewise, S.H.'s letter highlighted E.H.'s feelings of "depression . . . stemming from his separation with friends due to relocations" since "all of [his] closest friends . . . will be attending Churchill." J.R. 56. Both letters expressed that the requested COSA to Churchill HS would, as stated by Dr. Bernstein, "make a huge positive impact of his psychiatric condition and would avert any tragic consequences[.]" J.R. 55. On June 15, 2018, Murray informed Plaintiffs that MCPS had granted the COSA request, and that E.H. would be permitted to attend Churchill HS for ninth grade during the 2018-2019 school year.

**B.  Churchill High School**

After E.H. started at Churchill HS in the fall of 2018, Makeyda Soriano, E.H.'s new counselor, observed that he "seemed to be doing well" and believed that his updated Section 504 Plan was working. J.R. 1839. However, on November 9, 2018, Soriano learned from E.H. that he had made "cuts on his arm" while at home the prior weekend and had "discussed thoughts of hanging previously," which led her to complete an MCPS Crisis Center Referral Information form and an MCPS Suicide Risk Reporting form. J.R. 616-17. Dr. Bernstein contributed to the Crisis

4

Center Referral Information form, noting that despite the incident, E.H. was "not currently at risk to self or others," and that he would "be monitoring [E.H.] carefully and reevaluate[]" in the future. J.R. 616. S.H. later testified that the cuts "were more superficial." J.R. 1715.

From November 2018 to January 2019, E.H. received grades on individual assignments ranging from A to E, but he had multiple failing grades of E on individual assignments in five of his seven classes. Soriano and E.H.'s parents communicated regularly throughout the course of E.H.'s time at Churchill HS, and on December 1, 2018, S.H. contacted Soriano to express concern about E.H.'s grades. Soriano sought feedback from E.H.'s teachers and reported to S.H. on December 3, 2018 that E.H. was "not in jeopardy of failing any course." J.R. 62, 67-70. By December 11, 2018, Soriano learned that E.H. had not been "following through with some assignments" and was not coming to see her when requested, and she informed S.H. that she would schedule an Educational Management Team ("EMT") meeting for after the winter break that would include E.H.'s grade level administrator, the school psychologist, a pupil personnel worker, one of E.H.'s teachers, Soriano, and E.H.'s parents. J.R. 60-61. The purpose of the EMT meeting was to discuss E.H.'s "educational progress and determine whether any additional strategies would be appropriate in order to help him achieve the best possible education." J.R. 631.

On January 8, 2019, S.H. emailed Soriano in preparation for the upcoming EMT meeting and stated that Dr. Bernstein "feels that it would be beneficial to have [E.H.] screened for potential learning disabilities," to which Soriano responded that the topic could "definitely be a part of the discussions" during the EMT meeting and invited Dr. Bernstein to join the meeting by telephone. J.R. 477-78.

At the EMT meeting on January 16, 2019, the participants reviewed Secondary Teacher Reports, prepared for the meeting by E.H.'s teachers, that stated that E.H. was "easily distracted,"

was failing to turn in assignments "on time and completed," and was "frequently socializing with student(s) next to him during classroom tasks," and further stated that he "does not request [the] accommodations" available to him under his Section 504 Plan.  J.R. 73, 82, 88.  Other areas of concern were contributing during class discussions, working collaboratively with others, and E.H.'s "organization," which included completing assignments on time and arriving with necessary materials and was identified as an area of concern in four of seven classes.  J.R. 71-91. At the same time, E.H. received marks of "strength" or "satisfactory" in the majority of areas assessed by his teachers.  *Id.*  Further, as noted in the written summary of the EMT meeting, the participants discussed that E.H. had shown "positive change" including "improvement in school work," social engagement, and "comfort[] within class," and they discussed strategies for continued progress such as "mak[ing a] schedule" and having a "bi-weekly meeting with counselor," and to "request for [E.H.] to respond on test[s] and annotate on test[s]" in the future. J.R. 632, 1841.  Dr. Bernstein did not attend the EMT meeting, and there is no record reflecting that special education services were discussed or requested by E.H.'s parents at that time.

Then in February 2019, MCPS received an allegation from several of E.H.'s friends that E.H. had been harassing other students at Churchill HS.  On February 25, 2019, school officials informed E.H.'s parents at a meeting that an investigation had confirmed that E.H. had engaged in cyberbullying, harassment, and intimidation of multiple female students from November 18, 2018 to February 19, 2019 by creating two fake social media accounts on which he impersonated a male classmate in an attempt to cause the end of a relationship between the male classmate and a female student.  When the targeted female student discovered that E.H. had created the fake accounts, E.H. threatened to kill himself if she would no longer be his friend.  As a result of the incident, the students were directed to have no contact with each other and warned that any act of retaliatory

bullying or harassment was "strictly prohibited" and would be addressed. J.R. 636. Soriano requested that E.H.'s teachers excuse him from completing assignments because he was "quite depressed," was receiving outside support, and might not return to school for the reminder of the week. J.R. 635.

After the February 25, 2019 meeting, E.H.'s parents brought E.H. to Dr. Bernstein, who determined that E.H. was "safe to go home." J.R. 1689.   According to S.H., following the cyberbullying incident, E.H. was "very depressed," "quiet," and "just stayed in his room" and would not go to school. *Id.* Although Soriano communicated with Dr. Bernstein on February 27, 2019 to discuss next steps to assist E.H. in his return to school, E.H. never returned to Churchill HS.

### C.    Private Programs

At Dr. Bernstein's recommendation, and in light of E.H.'s behavior and refusal to attend school, E.H.'s parents had E.H. admitted into Dominion Adolescent Mental Health Hospital ("Dominion") in Falls Church, Virginia on March 6, 2019.  He remained there until March 25, 2019, at which point he was enrolled in Dominion's Partial Hospitalization Program ("Dominion PHP") until April 1, 2019.  During this time period, Churchill HS sent school assignments to E.H. On April 2, 2019, Dominion sent MCPS an "Educational Services Final Report," which stated that E.H. had "completed school assignments, when available and appropriate" and "did not demonstrate any significant behaviors of concern."   J.R. 647.   In this report, Dominion recommended that MCPS "[f]ollow up with [E.H.] after transitioning back to school" and "assign makeup work." J.R. 646. Although there was a box on the Final Report marked "Refer for Special Education Services," Dominion did not check this box or otherwise recommend in its report that E.H. be considered for special education. J.R. 646.

After leaving Dominion PHP, E.H. was admitted to the Newport Academy Partial Hospitalization Program ("Newport PHP") in Rockville, Maryland. In order to participate in Newport PHP, E.H. had to be enrolled it its academic program. Accordingly, E.H.'s parents formally withdrew E.H. from MCPS on April 4, 2019.

While E.H. was at Newport PHP, his parents arranged for him to receive a neuropsychological evaluation from Dr. Lisa Martin, which took place on April 24 and 25, 2019. Dr. Martin diagnosed E.H. with "Major Depressive Disorder; Unspecified Anxiety Disorder; [ADHD] Combined Presentations ([w]ith accompanying weakness in executive functioning); and Dysgraphia." J.R. 109. Based on the results of her evaluation, Dr. Martin concluded that E.H. required special education services though the establishment of an Individualized Education Program ("IEP") and specifically recommended "frequent teacher interaction" to help with structure and organization, "written directions with clearly defined dates for completion," "help in learning how to break down a long term project," and help in choosing an "academic planner in order to keep track of important deadlines" as accommodations to be employed "at school." J.R. 110. Dr. Martin also stated that E.H. would "work best with one-on-one or small group teaching." *Id.* Dr. Martin further advised that E.H. would also "require the kinds of accommodation that are typically needed by students with attention and learning challenges," including: "reduced courseload/homework"; "50% additional time on classroom tests and standardized tests," which should be taken "individually or in a small group"; use of a computer to compose answers and take notes; "access to teacher notes"; written guides for homework and long-term assignments and schedules of due dates for upcoming assignments; and "access to [a] counselor or resource room when feeling overwhelmed." J.R. 112. Dr. Martin did not, however, recommend a residential

special education placement for E.H. Notably, Dr. Martin's report and the special education recommendations contained within it were not shared with MCPS at that time.

E.H. remained at Newport PHP until October 4, 2019, when he transferred to Newport's residential program in Paloma, California. As of December 27, 2019, E.H.'s parents disagreed about where E.H. should attend school, with G.H. pushing for E.H. to attend school in Singapore rather than transition to a therapeutic boarding program in the United States. During this time period, they consulted with an education consultant recommended by Newport.

On February 10, 2020, E.H.'s parents enrolled E.H. at Shortridge Academy ("Shortridge"), a small boarding school in Milton, New Hampshire. J.R. 383. In March 2020, E.H. returned home to Maryland when Shortridge shifted to an online curriculum due to the COVID-19 pandemic. During this period of online instruction, E.H.'s Academic Advisor at Shortridge reported that he had been "more engaged with academics than when he was physically at Shortridge." J.R. 1430. G.H. stated in August 2020 that E.H. "did well with online learning when he was home during the spring." J.R. 1459.

### D. IEPs

On January 13, 2020, shortly before E.H. was enrolled at Shortridge, Plaintiffs' counsel contacted MCPS and requested that Defendants "begin the special education eligibility process." J.R. 145. Two days later, on January 15, 2020, Plaintiffs' counsel provided MCPS with a copy of Dr. Martin's report and recommendations for the first time. In response, MCPS scheduled an initial IEP team meeting for February 5, 2020.

In advance of that meeting, MCPS provided E.H.'s parents with a questionnaire, which they failed to complete. The meeting was attended by S.H., a representative of her attorney, the Assistant Principal of Churchill HS, the Churchill HS Resource Teacher for Special Education

("RTSE"), a school counselor, a school psychologist, a pupil personnel worker, and an MCPS attorney. After considering E.H.'s educational history, parental input, Dr. Martin's report, E.H.'s MCPS report cards, and existing data from Newport, the IEP team agreed that additional data was required to determine E.H.'s eligibility for special education services. Specifically, S.H. signed a consent form to allow MCPS to conduct an "Emotional/Social/Behavior Development" assessment of E.H. for this purpose, J.R. 728, 731, as well as an authorization for the release of confidential information from Newport and Shortridge to MCPS. In a March 31, 2020 email to staff at Shortridge, S.H. stated that she had "been working with an education lawyer for the past few months to try to get some financial assistance through our county school system (Montgomery County Public Schools)" and informed Shortridge that Churchill HS psychologist Kelly Gruitt had asked to speak to Shortridge as part of the IEP process. J.R. 1425.

On May 12, 2020, the IEP team reconvened and determined that E.H. met the requirements for educational disability under the primary disability category of "Other Health Impairment" and found that he required "specially designed instruction." J.R. 746. MCPS also considered finding E.H. to be eligible for special education under the category of "Emotional Disability" but concluded that "Other Health Impairment is the most accurate disability classification." *Id.*

MCPS provided Plaintiffs with a draft IEP on June 10, 2020 (the "June 2020 IEP"). The June 2020 IEP documented E.H.'s present level of academic achievement and functional performance and stated that, based on the information available to MCPS at that time, E.H.'s "executive functioning challenges are the most reflective of his challenges across all settings." J.R. 755. Accordingly, the June 2020 IEP offered special services aimed to address these issues, including the use of a computer or word processor during school to aid organization for longer written responses; paired verbal and visual instruction; rubrics, exemplars, and checklists for

10

written assignments; repeated directions; copies of student/teacher notes so that all instructions would be available in writing; assistance with organization; breakdown of assignments into smaller units; positive reinforcers; support accessing problem solving strategies; social skill instruction with a psychologist and school counselor to address how to cope with feelings; a bank of strategies to help manage stress provided by a psychologist and school counselor; and strategies to initiate and sustain attention.

The June 2020 IEP also provided that E.H. would be allowed to conduct tests in a small group setting seated away from distractions, and that he would receive 50 percent extended time on tests, as Dr. Martin had recommended.  The IEP also included goals for E.H. relating to improving his self-advocacy, social and emotional regulation, and executive functioning, the last of which included language specifically taken from input provided by Shortridge.

To implement the IEP, MCPS proposed that E.H. be placed in the Learning and Academic Disabilities ("LAD") program at Churchill HS, where he would receive supported instruction in English, Math, Science, and Social Studies with a general education teacher assisted by a paraeducator and would also attend a dedicated and self-contained daily resource session led by a special education teacher accompanied by a paraeducator, with a maximum of 15 students, at which he would work to achieve his IEP goals.  The IEP also offered weekly counseling sessions as a related service.  At a June 16, 2020 meeting of the IEP team that was attended by both G.H. and S.H., Plaintiffs rejected the proposed IEP, arguing that E.H. could not be successful in a "comprehensive high school setting" and instead "requires a higher level of service, in the form of a residential program."  J.R. 791.

Following their rejection of the June 2020 IEP, Plaintiffs filed their due process complaint on July 30, 2020.  In early October 2020, MCPS referred E.H.'s case to its Central IEP team, which

11

has greater visibility on the resources available across the MCPS system than a school-based IEP team and is sometimes engaged to review cases in which there is a dispute over the terms of the IEP. As part of this review, MCPS held a meeting on October 21, 2020, which was attended by E.H.'s counselors from Shortridge, at which Plaintiffs requested that new goals for emotional regulation and appropriate risk-taking be added to the updated IEP. After the meeting, Plaintiffs provided MCPS with additional information from Newport and Shortridge, including a copy of a September 4, 2020 Positive Development Treatment Plan from Shortridge. With this additional information, MCPS provided an updated IEP that had additional information on E.H.'s present levels of performance and added a new social and emotional behavior goal.

This updated IEP, discussed at a meeting with Plaintiffs on November 24, 2020 (the "November 2020 IEP"), generally included the same assessment accommodations and instructional supports as the June 2020 IEP but proposed that such services and supports would be provided exclusively by special education teachers and school social workers through the Enriched – Social Emotional Special Education Services ("E-SESES") program at Magruder High School ("Magruder HS") in Rockville, Maryland. Classes in the E-SESES program are self-contained and typically range between 3 and 12 students, with mental health support available on site. The November 2020 IEP also included 30 minutes of counseling with a psychologist and a school social worker every week. At that time, and until March 15, 2021, E-SESES programming was conducted remotely due to the COVID-19 pandemic, with counseling sessions conducted via Zoom, but E-SESES staff conducted outdoor home visits to build and maintain relationships with students.

In a December 4, 2020 letter from their attorney to MCPS, Plaintiffs rejected the November 2020 IEP and expressed their intent to "continue to seek funding and placement for [E.H.] at Short

12

Ridge." J.R. 974. As grounds for the rejection, Plaintiffs stated that "[E.H.] is making progress at Shortridge, where he is attending school in person, and a move at this time would be disruptive and likely cause regression," and that "we do not believe the program at Magruder is appropriate to meet [E.H.'s] needs." J.R. 974.

## II.   Procedural History

On July 30, 2020, Plaintiffs filed their initial due process complaint on behalf of E.H with the Maryland Office of Administrative Hearings. This complaint was later amended on December 8, 2020 following Plaintiffs' rejection of the November 2020 IEP. In their amended complaint, Plaintiffs claimed that MCPS denied E.H. a free and appropriate public education ("FAPE") in violation of the IDEA by "failing to timely find [E.H.] eligible for special education services" and by "failing to develop an appropriate [IEP] and placement for the 2020-21 school year." J.R. 6. As a remedy, Plaintiffs sought placement for E.H. at Shortridge for the 2020-2021 school year and reimbursement for tuition and expenses incurred in relation to E.H.'s enrollment at Newport and Shortridge from April 2019 to the present.

Following the filing of Plaintiffs' amended due process complaint, an administrative hearing was held before Administrative Law Judge Brian Patrick Weeks ("the ALJ") over the course of nine days from April 2021 to June 2021. The ALJ admitted a total of 211 exhibits from both parties and heard testimony from nine witnesses. Plaintiffs presented the testimony of: (1) Dr. Vincent Culotta, admitted as an expert in neuropsychology; (2) Dr. Martin, who is E.H.'s clinical psychologist; and (3) S.H., E.H.'s mother. MCPS presented the testimony of the following six witnesses: (1) Cabin John MS counselor Erika Murray and (2) Churchill HS counselor Makeyda Soriano, both admitted as experts in school counseling; (3) Churchill HS psychologist Kelly Gruitt, admitted as an expert in school psychology; (4) Churchill HS special education

13

teacher Lesli Gillman, admitted as an expert in special education; (5) Magruder HS E-SESES social worker Kimberly Stengle, admitted as an expert in clinical social work with an emphasis in special education; and (6) MCPS Central IEP Coordinator George Moore, admitted as an expert in special education and placement of students in special education settings.

In a 96-page opinion issued on July 7, 2021, the ALJ denied Plaintiffs' claims, concluding that "MCPS did not violate the IDEA by failing to find [E.H.] eligible for special education services prior to April 2019," and that "MCPS's proposed IEP and placement for the 2020-2021 [school year] did not deny a FAPE to [E.H.]" J.R. 2254. *See E.H. v. Montgomery Cnty. Pub. Schs.*, OAH No.: MSDE-MONT-OT-20-15685 (July 7, 2021).

As to the first issue, the ALJ found that although MCPS had learned of E.H.'s ADHD diagnosis at the end of seventh grade in May 2017, the school acted proactively to address his needs by implementing a Section 504 Plan which produced positive results in the classroom as demonstrated by teacher reports and E.H.'s final grades for eighth grade. Accordingly, E.H.'s "poor grades at a singular point in time during the second quarter" of ninth grade, when he was still "transitioning to high school expectations and experiencing significant difficulties with peer interactions," were "not a sufficient reason to suspect that special education services were necessary to address his ADHD." J.R. 2228. The ALJ further found that E.H.'s diagnoses of depression and anxiety were not shared with MCPS until January 2020, and that none of his teachers reported social or emotional concerns with his classroom performance during the January 2019 EMT meeting convened in response to E.H.'s grades and the cutting incident. Although S.H. testified that at the end of the EMT meeting, she asked Soriano about having E.H. evaluated for special education but was told that E.H.'s parents would have to pay for such testing, Soriano denied that such a conversation took place, and the ALJ found S.H.'s testimony on this issue to be

14

not credible, based on the lack of corroboration in the written record and S.H.'s own inconsistent testimony on this issue. Accordingly, the ALJ concluded that "MCPS did not have reason to suspect that special education services may have been necessary to address [E.H.'s] ADHD in 9th grade" or that E.H. "may have had some other undiagnosed disability that required the provision of special education services" until MCPS received Dr. Martin's report from Plaintiffs' counsel on January 15, 2020 and promptly convened an IEP team meeting on February 5, 2020. J.R. 2228. In so ruling, the ALJ distinguished several cases cited by Plaintiffs on the issue of MCPS's obligation to timely evaluate E.H. on the grounds that E.H.'s conduct was less severe, persisted for a shorter period of time, and was focused on online activity rather than in-classroom behavior observed by a teacher, and that the present case lacked the "clear causal nexus" to poor academic performance seen in the other cases involving IDEA violations. J.R. 2231-32, 2238.

As for the substance of the IEPs, the ALJ concluded that "both the June and November IEPs were reasonably calculated to enable [E.H.] to make appropriate progress in light of his circumstances." J.R. 2240. In reaching this conclusion, the ALJ found that the June 2020 IEP largely conformed to the recommendations contained in Dr. Martin's report, and that Plaintiffs "did not disagree with anything other than the placement recommendation." J.R. 2196. The E-SESES program proposed in the November 2020 IEP after additional information was received from Shortridge was "very similar to the approach at Shortridge" with respect to class size, counseling, and student case management. J.R. 2249. The ALJ generally credited the testimony of MCPS's witnesses regarding the appropriateness of the IEPs, finding that they had "provided more details to support their conclusion and those details are supported by the record." J.R. 2251. In contrast, the ALJ largely found Plaintiffs' witnesses to be "unpersuasive," J.R. 2245, and noted that although Plaintiffs rejected the IEPs in part due to their belief that E.H. required a residential

placement, Dr. Martin "specifically declined to make any placement recommendations during her testimony," J.R. 2244, and Dr. Culotta, while recommending a residential placement, "admitted that everything in the [November 2020] IEP can be delivered in a non-residential setting." J.R. 2250. Accordingly, the ALJ denied Plaintiffs' requests for reimbursement of past tuition expenses from Newport and Shortridge and for placement at Shortridge for the 2020-2021 school year. Plaintiffs then timely filed the Complaint in this Court pursuant to 20 U.S.C. § 1415(i)(2).

## DISCUSSION

Plaintiffs seek review of the ALJ's decision denying their request for placement at Shortridge for the 2020-2021 school year and reimbursement for tuition, costs, and expenses at Newport and Shortridge for the 2019-2020 school year. Plaintiffs argue the ALJ erred by failing to hold MCPS in violation of the IDEA for (1) failing to satisfy its obligation to identify and evaluate children with disabilities to determine whether they need special education, known as the "Child Find" obligation; and (2) failing to propose an IEP that would have provided E.H. with a FAPE. For their part, Defendants argue that the ALJ's decision should be affirmed, as MCPS had no reason to suspect that E.H. was in need of special education services before E.H. withdrew from MCPS on April 4, 2019 and it received Dr. Martin's Report on January 15, 2020, and because both of the proposed IEPs offered E.H. a FAPE in the least restrictive environment, as required by the IDEA.

## I.    Legal Standard

The IDEA "provides funds for states to educate children with disabilities, subject to conditions imposing substantive requirements on the education that is provided." *R.F. ex rel. E.F. v. Cecil Cnty. Pub. Schs.*, 919 F.3d 237, 241 (4th Cir. 2019). Specifically, it requires that recipient states provide a FAPE to children with disabilities. 20 U.S.C. § 1412(a)(1)(A). A FAPE includes

16

"special education," consisting of "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability," and "related services . . . as may be required to assist a child with a disability to benefit from special education[.]" *Id.* §§ 1401(9), 1401(26), 1401(29). Under the IDEA, children receiving special education must be educated in the "least restrictive environment . . . with children who are not disabled" to "the maximum extent appropriate." *Id.* § 1412(a)(5).

The IDEA grants courts "the authority to order school authorities 'to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper'" under the IDEA. *Gadsby v. Grasmick*, 109 F.3d 940, 950 (4th Cir. 1997) (quoting *Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985)). Plaintiffs "may recover if (1) the proposed IEP was inadequate to offer the child a FAPE and (2) the private education services obtained by the parents were appropriate to the child's needs." *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 320 (4th Cir. 2004) (citing *Burlington*, 471 U.S. at 370).

Parents seeking to enforce their children's rights under the IDEA must begin by filing a due process complaint. *See* 20 U.S.C. §§ 1415(b)(6), (f). The relevant state or local educational agency must then hold an "impartial due process hearing" addressing the claims. *Id.* § 1415(f). At the conclusion of the administrative process, the parents may assert the same rights asserted in the due process complaint in a civil action in either state court or federal district court. *Id.* § 1415(i)(2). A district court reviewing a decision of the educational agency "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C).

In reviewing the decision of the ALJ in an IDEA case, a district court must apply a "modified de novo review, 'giving due weight to the underlying administrative proceedings.'" *R.F.*, 919 F.3d at 244-45 (quoting *M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*, 553 F.3d 315, 323 (4th Cir. 2009)); *see also Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). In the evaluation of the administrative record, findings of fact which are "made in a regular manner and have evidentiary support" are considered "*prima facie*" correct, and a reviewing court that does not adhere to the factual findings must explain its deviation. *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). To determine whether an ALJ's findings were "regularly made," a district court "should examine the way in which the state administrative authorities have arrived at their administrative decision and the methods employed." *Id.* Findings of fact are not "regularly made" and are therefore "entitled to no weight" if an administrative officer departs "so far from the accepted norm of a fact-finding process designed to discover truth[.]" *Id.* at 104. Even if the district court determines that an ALJ's regularly made findings of fact are entitled to deference, however, the district court must make "an independent decision based on its view of the preponderance of the evidence" and decide "whether the state has complied with the IDEA[.]" *Sumter Cnty. Sch. Dist. 17 v. Heffernan*, 642 F.3d 478, 484 (4th Cir. 2011); *see* 20 U.S.C. § 1415(i)(2)(C)(iii). In making this independent decision, "courts should not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *R.F.*, 919 F.3d at 245 (quoting *Rowley*, 458 U.S. at 206). The party challenging the administrative decision bears the burden of proof to establish an IDEA violation. *Barnett v. Fairfax Cnty. Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991).

Here, where the ALJ relied on a fulsome record including 211 exhibits and nine days of testimony from nine witnesses and issued detailed factual findings in a lengthy opinion, the Court

18

concludes that the ALJ's factual findings were "made in a regular manner." *Doyle*, 953 F.2d at 105; *see also Sch. Bd. of the City of Suffolk v. Rose*, 133 F. Supp. 3d 803, 821 (E.D. Va. 2015) (finding that a hearing officer's findings of fact were entitled to due weight where the hearing officer "heard evidence from witnesses on direct, cross, and re-direct examination; admitted documentary evidence; ruled on objections; . . . and rendered a written final decision"). As discussed below, the ALJ's factual findings are also supported by the evidence and are therefore presumed to be *prima facie* correct. *See Doyle*, 953 F.2d at 105.

## II.    Child Find

Plaintiffs first argue that the ALJ erred by failing to hold MCPS in violation of its "Child Find" obligation under the IDEA. The IDEA's Child Find provision requires a school district to have policies and procedures in place to ensure that it identifies, locates, and evaluates children with disabilities to determine whether they need special education and related services. *See* 20 U.S.C. §§ 1401(3)(A), 1412(a)(3)(A). Pursuant to this requirement, a school district must evaluate all children "who are suspected of being a child with a disability" who is "in need of special education." 34 C.F.R. § 300.111(c) (2021); *T.B. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 571-72 (4th Cir. 2018). For the Court to sustain Plaintiffs' procedural Child Find claim, Plaintiffs must show that Defendants "overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate." *Bd. of Educ. of Fayette Cnty., Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007) (quoting *Clay T. v. Walton County Sch. Dist.*, 952 F. Supp. 817, 823 (M.D. Ga. 1997)); *see Durbrow v. Cobb Cnty. Sch. Dist.*, 887 F.3d 1182, 1196 (11th Cir. 2018); *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 750 (2d Cir. 2018); *Sch. Bd. of City. of Norfolk v. Brown*, 769 F. Supp. 2d 928, 942 (E.D. Va. 2010). A school district meets its Child Find duty "by initiating the IDEA-eligibility process[.]" *Durbrow,*

887 F.3d at 1196. Maryland law provides that an IDEA evaluation must be conducted within "60 days of parental consent for assessments" and "90 days of the public agency receiving a written referral." Md. Code Regs. 13A.05.01.06(A)(1) (West 2022). Absent such a request, a school district must begin the evaluation process within a "reasonable time" after the district is on notice of a disability requiring special education. *Durbrow*, 887 F.3d at 1196 (quoting *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 250 (3d Cir. 2012)); *Brown*, 769 F. Supp. 2d at 942.

Here, shortly after Plaintiffs' counsel sent Defendants a copy of Dr. Martin's report on January 15, 2020 in connection with a request that MCPS begin the special education eligibility process, Defendants convened an initial an IEP meeting for E.H., which was held on February 5, 2020. On May 5, 2020, MCPS determined that E.H. met the requirements for educational disability under the primary disability category of "Other Health Impairment" and found that he required "specially designed instruction." J.R. 746. MCPS also determined that E.H. met the requirements to be "identified as a student with an emotional disability." *Id.* Under the IDEA, an "Other Health Impairment" is defined as:

> Other health impairment means having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that—
>
> (i)     Is due to chronic or acute health problems such as . . . attention deficit disorder or attention deficit hyperactivity disorder . . . ; and
> (ii)    Adversely affects a child's educational performance.

34 C.F.R § 300.8(c)(9).

An "emotional disturbance" disability is defined as follows:

> Emotional disturbance means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:
>
> (A)     An inability to learn that cannot be explained by intellectual, sensory, or health factors.

20

     (B)     An inability to build or maintain satisfactory interpersonal relationships
               with peers and teachers.

     (C)     Inappropriate types of behavior or feelings under normal circumstances.

     (D)     A general pervasive mood of unhappiness or depression.

     (E)     A tendency to develop physical symptoms or fears associated with personal
               or school problems.

34 C.F.R. § 300.8(c)(4)(i).

The question at issue is whether MCPS violated the Child Find requirement by failing to initiate an evaluation of E.H. earlier than February 2020. The ALJ found that after E.H.'s withdrawal from MCPS in April 2019, "no further communication took place between anyone from MCPS and the Parents until January 2020," when Plaintiffs' counsel sent MCPS Dr. Martin's report and requested an evaluation for special education services. J.R. 2227. Where E.H. was not an MCPS student during that time period, the ALJ focused his decision on whether, by April 4, 2019, MCPS had reason to suspect that E.H. had a disability requiring special education services. Plaintiffs appeal the ALJ's conclusions that "MCPS did not have reason to suspect in ninth grade that [E.H.'s] ADHD required special education services" and "that there was no reason to suspect in ninth grade that [E.H.] had some other undiagnosed disability that required the provision of special education services." J.R. 2218.

## A.   Request for an Evaluation

As an initial matter, the Court addresses Plaintiffs' argument that MCPS was required to conduct a special education evaluation because S.H. requested it in January 2019. Maryland law allows a parent to refer a student with a suspected disability who may need special education. *See* Md. Code Regs. 13A.05.01.04(A)(2)(a). Though Plaintiffs argue that after the EMT meeting, S.H. inquired about a special education evaluation, the ALJ evaluated the testimony of the witnesses and, on the basis of various inconsistencies in the testimony, found S.H.'s testimony that she requested special education services from MCPS following the EMT meeting in January 2019 not

21

to be credible. Where the ALJ's findings of fact were "made in a regular manner and have evidentiary support," they are considered "*prima facie*" correct and the Court will not disturb the factual findings of the ALJ. *Doyle*, 953 F.2d at 105; *see Wagner v. Bd. of Educ. of Montgomery Cnty.*, 340 F. Supp. 2d 603, 611 (D. Md. 2004) (stating that "in according due weight to the findings of the ALJ, this court owes deference to the ALJ's determinations of the credibility of witnesses"). Although S.H. also mentioned to Soriano by email before the January 2019 EMT meeting that Dr. Bernstein had stated that it would be beneficial for E.H. to be evaluated for a learning disability, Soriano responded by inviting Dr. Bernstein to the meeting to discuss this issue, but Dr. Bernstein did not attend in person or by phone, and there is no evidence that S.H. raised the issue at the meeting, so this exchange is not fairly construed as a request for a special education evaluation. The Court therefore finds that Plaintiffs did not request such services or provide a copy of Dr. Martin's diagnosis and recommendation to Defendants until January 15, 2020, at which point MCPS promptly scheduled an IEP meeting.

Accordingly, the Court's analysis focuses on whether MCPS should have, on its own, suspected that E.H. had a disability that caused a need for special education and thus was obligated to conduct a special education evaluation.

## B.     ADHD

It is undisputed that Defendants were aware of E.H.'s ADHD diagnosis as of May 18, 2017, and that ADHD can satisfy the eligibility requirements for an "[o]ther health impairment" disability when it causes "limited alertness with respect to the educational environment" and "[a]dversely affects a child's educational performance." 34 C.F.R § 300.8(c)(9). Plaintiffs must demonstrate that by April 4, 2019, MCPS should have suspected that based on his ADHD, E.H. was "in need of special education." 34 C.F.R § 300.11(c)(1). "Special education" is defined as

"specially designed instruction . . . to meet the unique needs of a child with a disability." 20 U.S.C.

§ 1401(29); 34 C.F.R. § 300.39(a)(1).

> Specially designed instruction means adapting, as appropriate to the needs of an
> eligible child under this part, the content, methodology, or delivery of instruction—
>
> (i)   To address the unique needs of the child that result from the child's
>       disability; and
> (ii)  To ensure access of the child to the general curriculum, so that the child can
>       meet the educational standards within the jurisdiction of the public agency
>       that apply to all children.

34 C.F.R. § 300.39(b)(3).

Here, the ALJ found that "MCPS did not have reason to suspect that special education services may have been necessary to address [E.H.'s] ADHD in 9th grade." J.R. 2228. Though Plaintiffs focus on the apparent downturn in E.H.'s grades during ninth grade, the United States Court of Appeals for the Fourth Circuit has cautioned that "schools are not required to designate every child who is having any academic difficulties as a special education student," particularly where "[a]cademic challenges may reflect 'personal losses,' 'family stressors,' or 'unwilling[ness] to accept responsibility' on the part of the student." *T.B.*, 897 F.3d at 574 (quoting *D.G. v. Flour Bluff Indep. Sch. Dist.*, 481 F. App'x 887, 892 (5th Cir. 2012)). "Because academic struggles may arise from such a vast array of circumstances, determining whether intervention would help a student achieve a FAPE, and what type and degree of intervention would do so, is necessarily a 'fact-intensive exercise.'" *Id.* (quoting *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017)).

In *T.B.*, the Fourth Circuit held that a school district had violated the Child Find requirement by failing to evaluate a student for special education services until after it received a formal complaint in what would have been the student's eleventh grade year. *See* 897 F.3d at 569-70, 572-73. The student had failed a class in eighth grade, failed four classes in ninth grade, and

failed every class except algebra in the tenth grade, missed 68.5 days of school in ninth and tenth grades alone, and failed to advance to the eleventh grade entirely. *Id.* at 569. Most significantly, during ninth and tenth grades, the parents had repeatedly asked the school to evaluate the student or provide special education services and even provided the school with the results of a private test diagnosing T.B. with qualifying disabilities a full six months before he was found eligible by the school. *See id.* at 570, 573.

Here, in contrast, the problematic academic performance was limited to a single quarter. Plaintiffs point to E.H.'s poor "Student Assignment Scores," a document dated January 23, 2019, J.R. 67-70, which appears to list E.H.'s grades on individual assignments due between November 8, 2018 and January 23, 2019 and includes multiple Ds and Es, which are lower than the grades on E.H.'s report cards from seventh and eighth grade. *Compare* J.R. 67-70 *with* J.R. 149-50. However, as the ALJ noted, "this document represents, at best, a snapshot of [E.H.'s] grades towards the end of the second marking period." J.R. 2225. Unlike the seventh and eighth grade report cards in the record, they did not represent a grade for a full course or even for a single marking period. There was no evidence showing E.H.'s grades for the first marking period of ninth grade, much less any evidence that he had any extremely low grades that quarter. Particularly where the record shows that E.H was permitted to make up assignments and retake tests to raise his grades while at MCPS, *see, e.g.*, J.R. 421, 429, 438, it is not clear that the low grades on individual assignments were indicative of what E.H.'s final grades for the marking period or course would be.

Even if viewed as revealing a material decline in E.H.'s educational performance, it was a recent development that did not warrant an immediate conclusion that a special education evaluation was necessary. In contrast to the years-long trend of failing grades at issue in *T.B.*,

where the student in question received Cs, Ds, and Es in the seventh and eighth grades and failed most of his classes in ninth and tenth grade, E.H. received grades ranging from As to Cs in seventh and eighth grades and showed improvement from seventh to eighth grade, receiving four As, seven Bs, and one C during eighth grade in 2017-2018. *Compare T.B.* 897 F.3d at 569 *with* J.R. 149-150. *See also Richard S. v. Wissahickon Sch. Dist.*, 334 F. App'x 508, 511 (3d Cir. 2009) (finding no Child Find violation where extensive evidence in the record showed that a middle school student was "perceived by professional educators to be an average student who was making meaningful progress, but whose increasing difficulty in school was attributable to low motivation, frequent absences, and a failure to complete homework"). Where it was E.H.'s first semester in high school, and Soriano was aware that he continued to have "ongoing family conflict" and the difficult family circumstance of a having a father living overseas, J.R. 617, and that he was having social issues with his friends, Churchill HS officials reasonably could conclude that other issues in E.H.'s life, rather than ADHD, were responsible for his recent poor grades.

Moreover, the record supports the ALJ's conclusion that E.H. had responded positively to his Section 504 Plan to address his ADHD, as the improvement in E.H.'s classroom performance in eighth grade—which included a rise in his GPA for a marking period from 2.28 during the first marking period to 3.14 in the final marking period of eighth grade—followed the implementation of the Section 504 accommodations, as reported by his teachers. A review of E.H.'s classroom progress conducted at the end of eighth grade stated that as of May 11, 2018, his accommodations "had a huge impact in [E.H.'s] improvements this school year," and that E.H. was "doing a much better job of completing his work when he is in school." J.R. 46. As Soriano testified, at the beginning of E.H.'s ninth grade year at Churchill HS, E.H. "seemed to be doing well," and she "did not receive any communication from his teachers or him or his family indicating that there

was a concern with the 504 or accommodations." J.R. 1839. *See D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 251 (3d Cir. 2012) (finding no Child Find violation in part because the student's "report cards and conference forms indicated intermittent progress and even academic success in several areas"). Thus, when made aware of the lower grades on assignments in the second quarter, MCPS reasonably did not suspect that they were caused by E.H.'s ADHD. Indeed, when Defendants proactively arranged an EMT meeting "to discuss how [to] best support" E.H., J.R. 61, the Secondary Teacher Reports created in preparation for the EMT meeting noted that E.H. was no longer "request[ing] his accommodations," J.R. 88, reflecting that one immediate step to address the situation could be the reinstitution of the accommodations. Under these circumstances, the Court concludes that it was reasonable for Defendants to proceed with caution before seeking to evaluate E.H. for special education rather than first reinstituting the accommodations or refining the Section 504 Plan for his new high school environment. *See Mr. P*, 885 F.3d at 751 (holding that "[i]t was reasonable for the [school] to proceed deliberately when weighing whether a tenth grader, who had previously done well in school, should be enrolled in special education").

Notably, the ALJ credited the testimony of MCPS officials who testified that E.H. had not shown a need for special education prior to his withdrawal from MCPS. Murray, who interacted regularly with E.H. as his counselor at Cabin John MS, testified that E.H.'s grades at the end of eighth grade demonstrated this his Section 504 Plan was "supporting him appropriately." J.R. 1829. Gruitt, the Churchill HS psychologist, testified that "at the time of the EMT meeting" in January 2019, E.H. "was making progress" so "we would not have recommended moving to Child Find." J.R. 1867. Specifically, Gruitt testified that "[a]t that point in time, his schoolwork was improving," and that "turning his work in was the primary area of concern that I heard most about." *Id.* In her experience, problems with work completion typically does not mean that a student needs

an IEP. *See id.*; *see also Durbrow*, 887 F.3d at 1195 ("We add that special education is generally ill-suited for students who are making academic progress while neglecting to complete their work."). Finally, Soriano, who had extensive interaction with E.H. as his counselor at Churchill HS, testified that although in the past she had recommended that other students receiving Section 504 Plan accommodations transition to special education, based on her expertise and her interactions with E.H., he had not demonstrated a need for special education or for additional testing for an emotional disability prior to his withdrawal from MCPS. Instead, Soriano testified that, based on her experience responding to other incidents in which students had done detrimental things to their peer relationships, "[E.H.] could've returned" to Churchill HS despite the cyberbullying incident. J.R. 1847.

The Court finds that the ALJ gave "appropriate deference to the decisions of professional educators" in their determination that E.H.'s Section 504 Plan was the best way to address the academic impact of his ADHD based on the information available in 2019. *T.B.*, 897 F.3d at 572 (quoting *M.M. v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 533 (4th Cir. 2002)); *see also Durbrow*, 887 F.3d at 1196 ("When a school district uses measures besides special education to assist struggling students, it is even less likely in breach of its child-find duty."). This Court is also "rightfully reluctant to second-guess the educational decisions of professionals with first-hand experience not only with the student in this case, but with a wide variety of other students." *T.B.*, 897 F.3d at 576. The Court therefore agrees with the ALJ that MCPS did not have a reason to suspect that E.H.'s ADHD was causing a need for special education before he withdrew from MCPS in April 2019.

### C.     Other Disability

As to whether Defendants should have suspected that E.H. had some other undiagnosed disability causing a need for special education, such as an "emotional disturbance" under 34 C.F.R § 300.8(c)(4)(i), Plaintiffs assert that MCPS should have suspected such a disability based on Dr. Bernstein's May 2018 COSA letter seeking placement at Churchill HS, earlier diagnoses of depression, the arm cutting and cyberbullying incidents in ninth grade, and E.H.'s poor grades on individual assignments in the second marking period of ninth grade. However, Dr. Bernstein's COSA letter did not request a special education evaluation or services, acknowledged that E.H.'s middle school experience "had been going fairly well," and instead linked E.H.'s feelings of depression and anxiety to his assignment to Wootton HS and stated that allowing E.H. to attend Churchill HS would "make a huge positive impact on his psychiatric condition." J.R. 603. The Court agrees with the ALJ's conclusion that Defendants acted reasonably in granting this request as the appropriate means to address the stated concern rather than immediately suspecting a disability requiring special education.

Although Plaintiffs argue that MCPS should have suspected an emotional disability based on E.H.'s prior diagnosis of depression and his statement referencing suicide that resulted in a trip to the hospital on August 19, 2017 during the summer between seventh and eighth grade, these incidents took place outside of school, and the ALJ found that the Churchill HS officials were unaware of these facts at the time. Both Murray and Soriano, E.H.'s counselors, testified that they were unaware of the incident leading to the hospital visit, and there is no record of Plaintiffs communicating it to the school. According to Murray, she was not made aware of any diagnosis of depression. Indeed, to the extent that Dr. Pearlman's emails to Murray discussed E.H.'s condition, they addressed efforts to improve E.H.'s "ADHD," "organizational skills," "attention

span," "ability to concentrate," and "focus and task completion," rather than any diagnosis of depression or emotional disturbance. J.R. 563, 569, 571. Where the Court finds that the ALJ's findings of fact on these points are supported by the record, it accepts the ALJ's conclusion that the relevant MCPS officials did not have reason to suspect an emotional disability based on these issues.

As for the cutting and cyberbullying incidents and poor grades on certain assignments, these events all occurred over a short period of time between November 2018 and February 2019. Notably, the IDEA specifically defines an "emotional disturbance" disability as one which manifests itself "over a long period of time and to a marked degree that adversely affects a child's educational performance." 34 C.F.R § 300.8(c)(4)(i). As Soriano testified, E.H. "seemed to be doing well" during the first month and a half of ninth grade, J.R. 1839, the cutting incident occurred in early November 2018, and although Dr. Bernstein provided input to school officials shortly afterwards, he did not provide a diagnosis of a new disability or recommend an evaluation for special education. Notably, S.H. understood the cutting incident to be the result of academic pressures and the fact that a female friend in whom E.H. had become interested had expressed that "she wasn't interested in anything more than friends." J.R. 1686. E.H.'s poor grades began during that same month and were brought to Soriano's attention by S.H. in December 2018. Soriano reasonably responded by scheduling a January 2019 EMT meeting at which the reports about E.H. reflected that he was demonstrating "positive change" and "improvement in school work," and that he was "more engaged socially" and "comfortable [within] class" without any reports of social or emotional issues in the classroom. J.R. 632. At this point, with a single recent incident of disturbing behavior and a recent downturn in grades that had not yet caused significant alarm

among teachers, the Churchill HS officials did not yet have a basis to suspect an emotional disturbance disability.

Though the cyberbullying activity added a second incident, it did not involve conduct that would have been observed in the classroom, and it was not confirmed by MCPS until late February 2019. At that point, before any evaluation could be considered by the EMT or any other MCPS officials, E.H. was hospitalized at Dominion. Significantly, in the Educational Services Final Report prepared by Dominion and provided to MCPS on April 2, 2019, Dominion stated that E.H. had "completed school assignments" sent by MCPS and "did not demonstrate any significant behaviors of concern." J.R. 647. Dominion recommended that MCPS "[f]ollow up with [E.H.] after transitioning back to school" and "assign makeup work," but notably did not check a box on the Final Report for "[r]efer for Special Education Services." J.R. 646. Particularly where E.H.'s own treatment team at Dominion did not recommend special education to MCPS when given the opportunity to do so in the Final Report, the Court will not conclude that Defendants unreasonably failed to suspect that E.H. had an emotional disturbance or other new disability requiring special education. Once E.H. was withdrawn from MCPS on April 4, 2019 and was no longer its student, and Plaintiffs did not request an evaluation or communicate in any way that they were considering re-enrolling E.H. in the public schools in January 2020, MCPS reasonably did not pursue a special education evaluation.

Plaintiffs also point to the testimony of their expert witness, neuropsychologist Dr. Vincent Culotta, that E.H. required special education services beginning in seventh grade and particularly after the cyberbullying incident. However, the ALJ gave no weight to Dr. Culotta's testimony because his expert opinions relied on incidents occurring outside of school and information not known to the relevant MCPS officials, including E.H.'s behavior during his transition from Japan,

the August 19, 2017 hospital visit and depression and anxiety diagnoses, the request for a COSA, and Dr. Martin's April 2019 report. The ALJ also gave no weight to Dr. Culotta's testimony that the cyberbullying incident was part of a history of maladaptive social media use stemming from an emotional disorder when there was no evidence of prior misuse of social media of which MCPS was or should have been aware. Where the ALJ rejected Dr. Culotta's testimony and the record supports the ALJ's credibility determinations, the Court also concludes that Dr. Culotta's testimony does not demonstrate that MCPS was obligated to have provided special education testing before April 2019.

Finally, Plaintiffs also point to the fact that MCPS's May 5, 2020 IEP eligibility determination found E.H. in need of "specially designed instruction" as proof that MCPS should have suspected that he required special education as early as April 2019. J.R. 746. However, the mere fact that a subsequent evaluation of E.H.'s needs yielded a different result does not necessarily render MCPS's earlier determination inadequate. *See D.K.*, 696 F.3d at 251 (finding no Child Find violation where a school's April 2006 evaluation concluded that a student did not have a learning disability but November 2007 testing found an "other health impairment").

"A school's failure to diagnose a disability at the earliest possible moment is not per se actionable, in part because some disabilities 'are notoriously difficult to diagnose and even experts disagree about whether [some] should be considered a disability at all.'" *Id.* at 249 (quoting *A.P. ex rel. Powers v. Woodstock Bd. of Educ.*, 572 F. Supp. 2d 221, 226 (D. Conn. 2008)). Where the record does not demonstrate that Defendants were or should have been aware of a long history of conduct consistent with an emotional disturbance disability, and the two incidents at issue occurred over a short period of time and were not both known to MCPS officials until February 2019, the Court finds that Defendants did not unreasonably fail to suspect that E.H. had an undiagnosed

31

emotional disturbance disability requiring special education before E.H. was withdrawn from MCPS in April 2019. *See Mr. P*, 885 F.3d at 750-51 (holding that a school's failure to provide special education services to a student with an emotional disability was reasonable where the student "had not been experiencing problems over a long period of time" as required under the IDEA).

In the end, the Court must give "due weight to the underlying administrative proceedings" to "ensure[] that courts do not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *T.B.*, 897 F.3d at 572 (quoting *Rowley*, 458 U.S. at 206). Giving such due weight, the Court affirms the decision of the ALJ and concludes that MCPS did not breach its Child Find duty by failing to start the IEP process before E.H.'s withdrawal from MCPS in April 2019 and not until February 5, 2020, after it received Dr. Martin's report and recommendation from Plaintiffs' counsel.

## III.   IEPs

Plaintiffs also challenge the adequacy of the IEPs proposed by MCPS. To ensure delivery of a FAPE, the IDEA requires a school district to provide an appropriate IEP for each child determined to have a disability requiring special education and related services. *See* 20 U.S.C. §§ 1401(3)(A), 1414(d)(1)(A). "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). For example, for a child fully integrated into the regular classroom, an IEP should be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* Ensuring that an IEP is "reasonably calculated" to meet a student's needs "requires a prospective judgment by school officials," and "[a]ny review of an IEP must appreciate that the question is

32

whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* "[W]hether or not a program is appropriate is a matter of fact." *Doyle*, 953 F.2d at 105. The IDEA "requires great deference to the views of the school system rather than those of even the most well-meaning parent." *A.B v. Lawson*, 354 F.3d 315, 328 (4th Cir. 2004).

The IDEA also requires that a student with an IEP be placed in the least restrictive, appropriate environment:

> To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A); *see DeVries v. Fairfax Cnty. Sch. Bd.*, 882 F.2d 876, 878 (4th Cir. 1989) (stating that "[m]ainstreaming of handicapped children into regular school programs where they might have opportunities to study and to socialize with non-handicapped children is not only a laudable goal but is also a requirement of the Act"); *M.M. v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 526 (4th Cir. 2002) (holding that special education services "must be provided to a disabled child in the least restrictive and appropriate environment, with the child participating, to the extent possible, in the same activities as non-disabled children").

Plaintiffs argue that the ALJ incorrectly determined that the proposed IEPs would provide E.H. with a FAPE. Defendants argue that the Court should sustain the ALJ's decision because the evidence shows that the June 2020 and November 2020 IEPs both would provide E.H. with a FAPE in the least restrictive environment.

### A.    June 2020 IEP

As to the June 2020 IEP, Plaintiffs first argue that the November 2020 IEP itself constitutes an "admission" by Defendants that the June 2020 IEP failed to offer E.H. a FAPE. Pls. Mot. J.

33

Admin. Rec. at 28, ECF No. 22-1. The Fourth Circuit, however, has explicitly stated that such a comparison "is the exact opposite of what Congress intended when it provided for regular review and revision of IEPs, and it would do little to help the interests of disabled children," because "if services added to a later IEP were always used to cast doubt on an earlier one, school districts would develop a strong disincentive against updating their IEPs based on new information." *Schaffer v. Weast*, 554 F.3d 470, 477 (4th Cir. 2009); *see also M.K. v. Starr*, 185 F. Supp. 3d 679, 694 (D. Md. 2016) (holding that "courts should evaluate the appropriateness of an IEP as of the time it was created, not on the basis of services provided in subsequent IEPs"). Accordingly, the Court will evaluate the adequacy of the June 2020 IEP in its own right to determine whether it was "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances" at the time of its creation. *Endrew F.*, 137 S. Ct. at 999.

On the terms of the June 2020 IEP itself, the Court concludes that the ALJ's findings of fact are supported by the evidence and agrees that MCPS met its substantive obligation to provide E.H. access to a FAPE through the June 2020 IEP. The June 2020 IEP identified goals which addressed E.H.'s emotional and academic needs by setting reasonable objectives for "self-advocacy," "executive functioning," and "social and emotional regulation." J.R. 775-76. Notably, MCPS used language directly from Shortridge, at which Plaintiffs had chosen to place E.H., to craft the executive functioning goal in the June 2020 IEP. Likewise, as the ALJ observed, the June 2020 IEP contained nearly all of the services and supports recommended in the report of Plaintiffs' own expert, Dr. Martin, including access to a computer to do his work at school; 50 percent extended time and preferential seating and class size for tests; frequent teacher interaction; specific directions; help breaking down longer assignments; written directions, guides, schedules, planners, and notes; a small class size for a self-contained daily resource period taught by special educators;

and weekly counseling sessions. *Compare* J.R. 110-112 *with* J.R. 765-68, 791. Indeed, the June 2020 IEP contained additional services arguably not recommended by Dr. Martin, such as the use of positive reinforcers, support with accessing problem-solving strategies, and social skill instructions for coping with feelings. Where the June 2020 IEP contained the services originally recommended by Dr. Martin and found appropriate to support E.H.'s progress toward his goals by the IEP team after consideration of his educational data and parental input, the Court finds that it was sufficient to provide access to a FAPE. *See M.M.*, 303 F.3d at 532 ("We have always been, and we should continue to be, reluctant to second-guess professional educators . . . [O]nce a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second-guess the judgment of education professionals.").

Plaintiffs argue that the June 2020 IEP was deficient because it failed to propose a residential placement for E.H. and instead offered the Churchill LAD program. While Dr. Martin suggested that E.H. needed frequent teacher interaction and worked best with one-on-one or small group teaching, she notably did not state that E.H. could not be successful in a program such as Churchill LAD, which combined instruction by general education teachers supported by a paraeducator with a self-contained resource period led by a special education teacher and thus addressed Dr. Martin's recommendation for a "resource room" that E.H could access "when feeling overwhelmed." J.R. 112. Significantly, the June 2020 IEP also offered counseling with a psychologist and school social worker every week. It therefore aligned reasonably well with Dr. Martin's suggestions on the level of support needed from teachers and counselors.

Further, the MCPS expert witnesses testified that the Churchill LAD program would have adequately accommodated E.H. in the least restrictive environment because it offered services tailored to E.H.'s circumstances, including counseling and classroom supports that addressed his

executive functioning needs. At the hearing, Gruitt described the Churchill LAD program, noted that the IEP's recommendations were similar to Dr. Martin's recommendations, and concluded that the June 2020 IEP met E.H.'s needs at the time it was created because each of the required services and accommodations could be implemented through the Churchill LAD program. *See, e.g.,* J.R. 1876. More specifically, Gillman, the Churchill HS special education teacher, testified that the co-taught classes in the Churchill LAD program included dedicated "one-on-one assistance" from paraeducators, which would have allowed E.H.'s IEP to be implemented across all of his classes, not just the self-contained special education resource class. J.R. 1966. Gillman further testified that such an approach would have allowed E.H. to make progress on his executive functioning goals and have helped him "prioritize his assignments and be organized," both of which had been identified as primary areas of concern by his teachers and Dr. Martin. *Id.* Notably, Gillman testified that E.H.'s needs were "pretty typical" of students in the Churchill LAD program and stated that the program includes other students who, like E.H., have ADHD, anxiety, depression, emotional disabilities, and histories of past suicidal ideation, as well as students transitioning into the program from outside placements or residential schools like Newport or Shortridge. Accordingly, Gillman concluded that the Churchill LAD program was an appropriate placement for E.H. at that time.

Based on the specific information included in this testimony, the Court finds unpersuasive Plaintiffs' claim that that the ALJ erred in relying on the testimony of school officials because they did not provide cogent and responsive explanations for their decision. The Supreme Court has expressly reaffirmed that the conclusions of educators are entitled to deference. *See Endrew F.,* 137 S. Ct. at 1001 ("This absence of a bright-line rule, however, should not be mistaken for 'an invitation to the courts to substitute their own notions of sound educational policy for those of the

school authorities which they review.'" (quoting *Rowley*, 458 U.S. at 206)).  Here, too, where the ALJ evaluated the credibility of the witnesses and generally credited the testimony of the MCPS experts regarding the appropriateness of the IEPs, finding that they had "provided more details to support their conclusion and those details are supported by the record," J.R. 2251, and where the testimony included cogent and responsive explanations for the decision, the Court will give the ALJ's findings due weight and credit the testimony of the MCPS educators and special education experts.

Upon consideration the record, and cognizant of the principles that the creation of an IEP "requires a prospective judgment by school officials," that the question at issue is "whether the IEP is *reasonable*," not whether it is "ideal," *Endrew F.*, 137 S. Ct. at 999, and that the IDEA requires that a student be educated in the least restrictive environment, the Court concludes that the proposed placement in the Churchill LAD program was reasonably calculated to allow E.H. to make appropriate progress in light of his circumstances.  *See DeVries*, 882 F.2d at 878.

**B.    November 2020 IEP**

Between the development of the June 2020 IEP and the November 2020 IEP, MCPS received new information from Plaintiffs, particularly through discussions with E.H.'s parents and Shortridge counselors during an October 21, 2020 meeting about progress at Shortridge, such as that E.H. was doing better but needed one-on-one interactions to get his work done.  Audrey Everson, a Shortridge counselor who attended the meeting, also reported that E.H. internalized anger, which could cause him to disengage academically and become sidetracked with his anger. MCPS also reviewed E.H.'s Shortridge Positive Development Treatment Plan, which had not been created or provided to Defendants until after the June 2020 IEP was finalized.  Notably, Moore, the MCPS Central IEP Coordinator, testified that the IEP team considered the new information

from Shortridge and used the Positive Development Treatment Plan in determining that E.H. required a placement in the Magruder E-SESES program rather than the Churchill LAD program. In particular, Moore testified that the Treatment Plan was "useful" to the extent that it provided the IEP team with information about E.H.'s emotional condition, such as "[t]he fact that he gets involved in others' conflicts. The fact that he can be dishonest. The fact that his peers distrust him." J.R. 2069. Likewise, Gillman testified that the new inputs from Shortridge demonstrated that "things had changed for [E.H.] from June" to November 2020. J.R. 1971.

With this new information, the E-SESES program was proposed because it had "on si[te] mental health supports" and "no bullying," included programs to "build[] social emotional relationships," and because its students were of "average or above average intelligence" and "not physically aggressive." J.R. 219. Where the November 2020 IEP updated E.H.'s present levels of performance and added a new social and emotional behavior goal in addition to many of the supports contained in the June 2020 IEP, to be implemented through the self-contained E-SESES program at Magruder HS, the Court finds that the IEP was appropriately responsive to E.H.'s needs and reasonably calculated to enable him to make progress appropriate in light of his circumstances.

In challenging the substantive validity of the November 2020 IEP, Plaintiffs argue that Defendants and the ALJ failed to consider the extent of E.H.'s mental health issues and thus erred by failing to find that an in-person residential placement was required to enable E.H. to make appropriate progress. However, residential placement is not warranted where it would merely "enhance an otherwise sufficient day program." *Burke Cnty. Bd. of Educ. v. Denton*, 895 F.2d 973, 980 (4th Cir. 1990). Dr. Martin did not recommend a residential placement in her report and explicitly declined to render any opinion on the appropriateness of any of E.H.'s school placements in her testimony before the ALJ. In contrast, several of the MCPS experts testified that a residential

placement was not necessary to meet E.H.'s needs, including Soriano, the Churchill HS counselor; Gruitt, the Churchill HS psychologist; Gillman, the Churchill HS special education teacher; and Moore, the MCPS Central IEP Coordinator. *See* J.R. 1848, 1886, 1971, 2061-62. In particular, Moore testified that while he has recommended students for residential placements and has even placed MCPS students as far away as Utah, he did not believe that E.H. needed a residential placement based in part on the facts that he would receive instruction from certified special education teachers in a "100 percent self-contained" environment at E-SESES and would have access to a psychologist and social worker all day. J.R. 2059-61. He further testified that E.H. fits the profile of the students at E-SESES, many of whom face similar issues relating to school avoidance, peer interaction, and executive functioning, and that his needs are not as significant as those of students in MCPS's main residential program, many of whom have histories of "physical aggression" and "years of dysfunctional behavior" at school that are not at issue with E.H. J.R. 2073. Stengle, the Magruder HS E-SESES social worker, similarly testified that E-SESES includes students who, like E.H., have ADHD, other health impairments, emotional disabilities, and suicidal ideations, and that such students are "extremely successful in the program" and typically graduate. J.R. 2022. On this record, Court does not find that a residential placement was necessary to provide a FAPE.

Plaintiffs also cite the E-SESES program's temporary transition to online learning during the COVID-19 pandemic as an inadequacy of the November 2020 IEP. At the due process hearing, Dr. Culotta, Plaintiffs' expert witness, testified that E.H. would benefit from an in-person environment due to his ADHD and his prior history of maladaptive social media use. This opinion, and the need for a placement at Shortridge to avoid online learning during the COVID-19 pandemic, were undermined by the report of E.H.'s Shortridge teacher that when Shortridge

transitioned to online learning, E.H. had been "more engaged with academics than when he was physically at Shortridge," and by G.H.'s statement that E.H. "did well with online learning when he was home during the spring." J.R. 1430, 1459. Further, as Stengle testified, most E-SESES students performed well during online learning, and when difficulties were identified, the E-SESES program accommodated those who had challenges by ensuring that students were able to "meet[] one-on-one with teachers or paraeducators that had specialty in the subject." J.R. 2018. In light of E.H.'s prior history of success with online education, and of the E-SESES program's supports for students, the Court concludes that, as found by the ALJ, the November 2020 IEP was reasonably calculated to enable E.H. to make progress in light of his circumstances despite the lack of a residential placement and the temporary transition to online learning.

Finally, the Court finds Plaintiffs' claim that the November 2020 IEP was insufficient because it did not provide for therapy integrated into the school program to be unpersuasive. First, this is a new concern not raised at the time that the November 2020 IEP was rejected. In their letter rejecting that IEP, Plaintiffs expressed their intent to "continue to seek funding and placement for [E.H.] at Shortridge," stating only that "[E.H.] is making progress at Shortridge, where he is attending school in person, and a move at this time would be disruptive and likely cause regression," and that "we do not believe the program at Magruder is appropriate to meet [E.H.'s] needs." J.R. 974. Plaintiffs did not argue that the severity of E.H.'s emotional disabilities required therapy integrated into his schooling.

Second, Plaintiffs have not shown how integrated therapy is necessary to provide a FAPE. Notably, while Dr. Martin recommended continuing psychotherapy such as the therapy received from Dr. Bernstein, she did not recommend that such therapy had to be integrated into the curriculum. Indeed, Dr. Martin's report also states that "[E.H.]'s profile suggests that he will likely

40

respond best to a behavioral management approach rather than to traditional psychotherapy." J.R. 107. Before the ALJ, Gillman confirmed that she did not view Dr. Martin's recommendation for continued therapy as tied to E.H.'s academic programming needs. Although Dr. Culotta testified that E.H. needs "a structure, an environment, that is fully integrated and allows generalization from the classroom to peer relationships to the therapy setting and that really is the treatment model and the educational model for him to make progress in both of those domains," J.R. 1526, Stengle confirmed that the E-SESES program is able to provide for these needs and allow students like E.H. to make progress in both domains without integrated therapy. Specifically, she testified that it does so by "work[ing] with outside providers to have discussions about what's going on within the school setting, what's going on in the home setting, how we can support each other, different strategies that have been working in school, [and] different strategies that have been working at home[.]" J.R. 2019. Accordingly, Plaintiffs have not explained how regular psychotherapy, including family therapy, must be integrated in the school curriculum in order to provide a FAPE. *See Irving Indep. Sch. Dist. v. Tatro*, 468 U.S. 883, 894 (1984) (stating that "only those services necessary to aid a handicapped child to benefit from special education must be provided" and that "if a particular medication or treatment may appropriately be administered . . . other than during the school day, a school is not required to provide . . . services to administer it").

Third, the IEP contained counseling services that address some of the same needs. *See Q.K. v. Smith*, No. JKB-21-0283, 2022 WL 912720, at *14-15 (D. Md. Mar. 29, 2022) (holding that the exclusion of psychotherapy services from a student's IEP did not deny access to a FAPE where "the counseling services provided in the Final IEP were calculated to address the same psychological needs as the therapy," namely "attention, anxiety, and social relationships"). Stengle testified that the E-SESES program does "use therapeutic strategies," J.R. 2033, and has

"a psychologist that is part of [the] program," J.R. 2027, and Moore testified that the counseling provided by E-SESES would "help [E.H.] access the instructional program and make progress on his goals and develop coping methods for in the moment situations in school as opposed to determining why he's acting in the way, giving him strategies to use in school to address frustration, [and] address peer conflicts." J.R. 2068. The Court agrees with the ALJ's conclusion that Plaintiffs failed to carry their burden to show that MCPS's failure to include any of the services described above denied E.H. access to a FAPE.

Because the Court concludes that Defendants satisfied their Child Find obligations and that both IEPs provided E.H. access to a FAPE, the Court will not grant reimbursement to Plaintiffs for the cost of enrollment at Newport and Shortridge for the 2020-2021 school year and will not order placement at Shortridge for the 2021-2022 school year.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Judgment on the Administrative Record, ECF No. 17, will be DENIED, and Defendants' Cross Motion for Judgment on the Administrative Record, ECF No. 20, will be GRANTED.  A separate Order shall issue.

Date:  August 30, 2022

THEODORE D. CHUANG
United States District Judge